## CHARLES A. HARNER *v.* THOMAS A. RUSSELL AND CATHERINE RUSSELL
### (Two Cases)

[No. 47, October Term, 1945.]

*Decided January 8, 1946.*

The causes were argued before MARBURY, C. J., DELA-PLAINE, COLLINS, GRASON, HENDERSON, and MARKELL, JJ.

*W. Clinton McSherry,* with whom was *Theodore F. Brown* on the brief, for the appellant.

*Ralph G. Hoffman,* with whom was *Herbert H. Rosenbaum* on the brief, for the appellees.

GRASON, J., delivered the opinion of the Court.

Catherine Russell sued Charles A. Harner in the Circuit Court for Frederick County for damages sustained by her by reason of alleged negligence of the defendant directly contributing thereto and without fault on her part. At the same time her husband, Thomas A. Russell, instituted suit against Charles A. Harner in the same court for loss of services of his wife, Catherine, the plaintiff in the case first referred to. The cases were removed to the Circuit Court for Carroll County, there consolidated and tried before a jury, resulting in a judgment in each case against the defendant. The defendant appeals to this Court from the judgments rendered against him in these cases.

At the conclusion of all of the testimony adduced by the plaintiffs and defendant, the defendant offered prayers A, B and C which, in one form or another were demurrers to the evidence. These prayers were refused, and the correctness of these rulings constitutes the only question presented on this record. A review of the evidence is, therefore, required.

On May 20, 1943, at about 5 o'clock in the afternoon, Catherine Russell was a passenger on a street car operated by the Baltimore Transit Company, on her way

home to Owings Mills, in Baltimore County. The car was bound north on Reisterstown Road, a public street in the City of Baltimore, and operated at the time on the northbound track of the Transit Company. Between the east rail of that track and the east curb, the street is twenty-five feet in width. At about the place of the accident the car was traveling a slight upgrade. The plaintiff was seated on the east side of the car, on the longitudinal seat, about midway between the front and the rear of the car. All of the seats in the car were taken and a few passengers were standing. It was traveling about twenty miles an hour. The defendant was operating a two-ton truck and carrying a load of about three-quarters of a ton.

Mrs. Catherine Russell testified "that while she was sitting on the side of the street car all of a sudden a lot of people on the street car started to holler; that she looked back, and there was a truck come up alongside and hit in the back of the street car right near her back, right in back of her; that it threw her to the floor; and she heard another bump and lost consciousness."

Colie Sparrow was the mortorman operating the street car at the time of the accident. He testified: "That at the time of the accident he was coming north on Reisterstown Road when someone hollered and screamed; that he turned to look to see what the commotion was, and he saw this truck coming toward him, and by that time it struck the side of his car near the center, and by the time he braked the car it struck the second time on the front doors. * * * That the truck hit the center of his car; that it hit the second time; that the second time it hit it hit to the front of the car; front side on the right-hand side. That when Mr. Harner struck his car the first time he hit the center of the car, but the second time he came and struck the front of the door and pulled that front left door off its hinges. That as soon as the accident occurred he stopped. That he stopped slowly. 'The car stopped very slowly.' That

before the collision he was running about fifteen or twenty miles per hour. That he was right near Whittier Avenue and Reisterstown—almost to the intersecting street. That Mr. Harner's truck did not pass him while he was starting away from a safety zone."

Ray H. Kiser testified that he was employed by the Department of Education of Baltimore City. He was a passenger on this car. "That he was standing looking out the window, holding on to one of the straps, and all of a sudden while the car was in motion the truck just swerved into the car and made a terrible crash, and he let out a yell, because he thought the glass was going to fly, and then the car proceeded on a little bit. That it seemed to him like the truck went along, was going faster that the street car was, and when he got off the car, the truck was just a little, maybe five or seven steps back from the front end of the car. That the truck first struck the car just about where he was standing; it struck it in the center and then kept going and jammed into the front of the car. That the car was one that operated on tracks. * * * That when the truck hit the car she (Mrs. Catherine Russell) fell at his feet and just rolled over. * * * That when both vehicles had stopped the truck was behind the street car. That he got off the front door and walked back to where the truck was and where the driver was with the truck. That the whole street car had not passed the truck at that time—the truck was by the side of the street car, but back of where he got out; that he got out the front and walked back to the truck on Reisterstown Road."

Dr. N. Clyde Marvel testified to the injuries suffered by Mrs. Russell as a direct result of the accident. The husband, Thomas A. Russell, testified to the loss of services of his wife and to the payment of doctors' bills and hospital expenses.

Having produced this evidence the plaintiffs closed their case.

The defendant, Charles A. Harner, testified as follows: "That on the afternoon of May 20, 1943, he was

coming out Reisterstown Road, 'passed the street car at a safety zone, which was unloading passengers. I drive on up the street parallel with the car tracks. Seeing a child playing there at Whittier Avenue in front of a parked car, I swerved to my left, and I presumably hit the street car or the street car hit me on the right rear end of my truck'." He later said his truck was struck at the left rear end and that the damaged caused thereby did not amount to a dollar. "That Reisterstown Road near Whittier Avenue * * * is a wide street with car tracks—two car tracks. That this car was going north." He said he was probably fifty or seventy-five feet from the child when he saw it playing in front of this parked car; that he pulled his car out on an angle with the car track, which would be on his left. That it wasn't very long after he saw the child that he turned his truck to the left. He was traveling twenty miles an hour; that the street car "was traveling right fast, * * * and no sound of a bell on the street car." He said that after the collision "when I was stopped, pulled to the side of the street, the street car was parked directly across from me. Q. You mean he passed you? A. Well, he was right in straight with me. He was back of me and I pulled over and parked my truck and he stopped like on the side of me. Q. Where was that with reference to the parked car? A. That was in front of that. Q. You had passed that? A. That's right. Q. That was back of your truck. A. That was probably back of me maybe fifty or twenty-five feet." He doesn't know where the child went after the accident. He testified, on cross-examination, that the child was "probably ten feet; just in front of the car" and that he first saw this child fifty or seventy-five feet away, when it was playing in front of this car. "Q. What did the child do that caused you to swerve to the left? * * * A. I couldn't say the child did anything. I was on guard, afraid the child might run across the street, something like that. * * * Q. What did the child do that caused you to swerve to the left, if anything? A. Well, I would say the child was playing

there and I was being cautious, that was all." He further testified that he blew his horn when the child was probably four or five feet from the curb in front of the parked car. "Q. Did the child at any time go further out into the street? A. Yes, the child was playing and running around. Q. Did it move out into the path of your truck? A. I wouldn't say it did, no. * * * Q. Mr. Harner, do you remember, whether the child did or did not come out into the path of your car? A. No, I couldn't say that the child come out in the path of my car because it was playing there and, of course, I didn't know what the child was playing with—a ball, or what. I thought it might throw something or fall or something like that." He testified that the child was facing the street car and his truck, in front of the parked car. "Q. What I want to know—did the child move out into the street further? A. No, I wouldn't say that it did. * * * Q. The only explanation you have for your swerving to the left was because the child was there? A. That's right. Q. And the child didn't run out or didn't do anything that caused you to swerve? A. That's right."

Harner testified in the traffic court. He was asked if he didn't testify in the traffic court, as follows: "Q. Do you recall the question being asked you, did the child run? and your answer was: He run out opposite five feet in front of the car. Question: What did you do? Answer: I just kept bearing the same way. Question: did you pull to the left? Answer: No, sir, no pulling to the left. Do you recall testifying to that?" And he answered: "I believe I did." "Q. And that you said, 'No, sir, no pulling to the left,' didn't you? A. I don't remember that. Q. If I show you this question, 'did you pull to the left?' Answer: 'No, sir, no pulling to the left,' would you say you did or did not say that? A. I may have said that. Q. But now you say you did swerve to the left? A. Well, it would be only natural. I was running at a ten-degree angle; cut across over the street car track; I guess you would call that pulling to the left." He was asked concerning the report of the accident he made to

the Commissioner of Motor Vehicles. "Q. Did you in your report say, I slowed down and kept my eye on the child, but when about even with the child the child made a move towards my truck and I verred to my left when the street car going in the same direction came in contact with my tail end? A. I did. Q. Did the child make a move towards your truck? A. Well, I couldn't say. It may have made a couple of steps. Something like that." He further testified he did not stop or reduce the speed of his truck when he first saw the child, as he did not think it was necessary, because he thought he had plenty of room.

Victor Eyler was employed that day by the defendant, and was traveling with him at the time of the accident. He testified: "I saw the parked car on the right side next to the curb and a little child come out across from the street * * * and to avoid hitting the child, he had to swerve out this way to the left and go back in and then is when the street car come up and hit the back side of the truck." He did not testify at the traffic hearing and the defendant did not mention him as a witness in his report of the accident to the Commissioner of Motor Vehicles. He saw the child when the truck was twenty-five feet away from it, when it came out from the curb, right in front of the parked car; it "sort of stopped, just got excited, like, and stopped, and went back towards the street and didn't see no more of it." He also testified that the child moved out "about twenty-five feet from the pavement out to where the car was parked, out in front of it." And, "at that time when we come up there in a truck, to avoid hitting the child, the child went back; went back the other way. * * * Q. You mean it was within a step or two of the street car track is that right? A. Yes, sir. * * * Q. Where was the child when your truck went by; still within a step or two of the street car track? A. No, it had went back as soon as it saw the truck, as soon as it saw the truck make a swerve this way."

It is difficult to imagine a sharper conflict in the evidence of the plaintiffs and the defendant as to how this accident happened. The evidence of Mrs. Russell, Mr. Sparrow, the motorman, and Mr. Kiser, tended to show that the street car, in which Mrs. Russell was riding as a passenger, was struck about midway of its length by the defendant's truck; that the truck bounded off and again struck the street car at its front end, and as a result of this collision Mrs. Russell was severely injured and her husband sustained damages because of her injury. Assuming the truth of this testimony, it is perfectly apparent that the defendant was negligent in the operation of his truck and that such negligence was the direct and proximate cause of the damage suffered by each plaintiff. There is a sharp conflict between the evidence of the defendant and his only witness, Eyler.

The defendant's account of this accident differs in material particulars. He states that the child was in front of the parked car when his truck was fifty or seventy-five feet from it. On cross-examination he stated that the child was probably ten feet just in front of the car and was playing at the time and that he was on guard, afraid that the child might run across the street. There is no evidence that he slowed down when he first saw the child. He stated he did blow his horn, but how far he was from the child when he blew his horn is not stated. He stated again that the child was in front of the parked car, probably four or five feet from the curb, but he could not say that the child came out into the path of his truck. The child was facing the street car and his truck and while the child was in that position he swerved his truck to the left and the accident happened. He further testified that the child did not run out or didn't do anything that caused him to swerve, and he admitted at the traffic court hearing that when he saw the child in front of the parked car he kept bearing the same way, and did not pull his truck to the left. His testimony is conflicting and gives different accounts of how this accident happened.

His witness Eyler gives an account of the accident even different from the accounts given by the defendant. Eyler's evidence is in direct contradiction of the defendant's testimony. He swore that the child was within a step or two of the east rail of the car track and turned and ran back to the curb.

The defendant contends the evidence in this case shows that he was confronted with a sudden emergency caused by his fear of hitting the child, and he pulled to the left, causing the street car to hit the left rear of his truck; and that the evidence in this case presents that question to the court as a matter of law, and this contention is the basis of the demurrer prayers which were rejected.

As authority for his position, he relies chiefly upon the case of *Burhans v. Burhans*, 159 Md. 370, 150 A. 795. In that case there was no conflict of evidence as to the happening of the accident and the question, therefore, became one of law for the Court's determination. The evidence as to the happening of the accident in this case is sharply conflicting and there can be no question that it was one to be decided by the jury.

In *Davidson Transfer & Storage Co. v. State, Use of Brown*, 180 Md. 63, at page 69, 22 A. 2d 582, 585, in ruling upon the lower court's refusal to grant a demurrer prayer, it is said:

"In view of the evidence, did the trial court err in refusing to grant defendant's A prayer? It is to be borne in mind that the truth of the plaintiff's evidence and inferences logically deducible therefrom must be assumed in answering this question, for if defendant's testimony flatly contradicts that of the plaintiff, still if the plaintiff's evidence is in itself sufficient to justify submitting the case to the jury, it cannot be withdrawn, for in that event conflicts are properly determinable by the jury." See a number of decisions of this Court there cited.

In *Newman v. Stocker*, 161 Md. 552, at page 554, 157 A. 761, 762, the late Chief Judge Bond, speaking for this Court, said:

"For the defendant, it was prayed that a verdict might be directed in his favor on the ground that the evidence was legally insufficient to prove any negligence on his part in meeting the emergency he described, and on the ground that the plaintiff was herself guilty of negligence which contributed to the accident. But as to the first ground, it seems sufficient to point out that the existence of the emergency was not admitted, and therefore could be established only by a finding of the jury. And if the jury should find the emergency to have caused the swerving from the hard surface of the road, they might still, we think, conclude that the subsequent acceleration of the speed of the car, to which the defendant testified was a mistake, which a driver exercising due care would not have made, and was the cause of the collision with the pole. And in the sudden occurrence which the witnesses agree in describing, there was no opportunity for the plaintiff to be guilty of contributory negligence."

The action of the court in submitting these cases to the jury was correct.

*Judgment affirmed in each case, with costs to appellee.*